GARY STRIPLING, and
LOUISE STRIPLING,
        Plaintiffs,
v.

SHAUNA, INC., d/b/a SOLITAIRE HOMES,
        Defendant.

    The undersigned being appointed by the parties as arbitrator in this matter, and having conducted a hearing at which witnesses testified under oath, and the parties introduced exhibits, and the parties being given time to obtain and submit follow up evidence, and given the opportunity to present written closing argument, and requested findings of fact and conclusions of law, the arbitrator hereby adopts the following:

## FINDINGS OF FACT

1. Shauna, Inc., d/b/a Solitaire Homes, was a seller of manufactured homes with sales offices in Albuquerque, Los Lunas, and Farmington, New Mexico, at all times relevant to this cause of action.

2. George Sulima was the president of Shauna, Inc. at all times relevant to this cause of action. Barbara Duesterbeck was and employee of Shauna Inc., and employed as the manager of the Farmington Solitaire lot at all times relevant to this cause of action.

3. Gary and Louise Stripling are residents of Aztec, New Mexico.

4. The Striplings had purchased five acres of land in Aztec on which they intended to build a house, but instead decided to buy a manufactured home because they needed a home quickly.

5. The rent on the single wide manufactured home that they occupied at the time that they purchased a manufactured home from defendant was $525 a month.

6. On or about October 3, 2002, Louise Stripling stopped at the Solitaire Homes lot in Farmington to look at manufactured homes.

7. At the time that Louise Stripling visited Solitaire Homes, she had already picked out a manufactured home at a competitor's lot, Palm Harbor, but wanted to see the Solitaire homes before making a final decision.

8. Louise Stripling met with Barbara Duesterbeck, a sales representative of Solitaire Homes, who showed her three manufactured homes. Because of the size of the homes


EXHIBIT B

Case 09-07001-hdh   Doc 12-3   Filed 07/31/09   Entered 07/31/09 21:01:26   Desc
Exhibit Findings of Fact and Conclustions of Law   Page 2 of 13

and the needs of the family, Louise Stripling selected a model 8632, which measured 86 feet by 32 feet and was the only manufactured home that the defendant offered that was suitable for the Stripling family.

9. Louise Stripling did not like the color scheme of the model 8632 home on Solitaire's lot, which had blue and gray accents and color scheme.

10. The fireplace in the model 8632 on Solitaire's lot was a wood burning fireplace which was something that Louise and Gary Stripling were very interested in.

11. Barbara Duesterbeck consulted with George Sulima about Louise Stripling's objections to the model on the lot. Mr. Sulima then contacted Deming Manufactured Homes, LLC, and asked that it provide a model 8632 to Farmington, in the color scheme that Louise Stripling wanted.

12. Barbara Duesterbeck called Louise Stripling at her work at Sunrise Quality Mortgage, and told her that she had located a model 8632 "exactly like the one on the lot" with the color scheme that Louise Stripling wanted.

13. In response, Louise Stripling went back to the Solitaire lot at least three times to show other people the model on the lot that she had selected.

14. Louise Stripling went one time with her husband, Gary Stripling, at which time Barbara Duesterbeck showed them the model 8632 home. Barbara Duesterbeck told Gary Stripling that the fireplace was wood burning.

15. Louise Stripling took Michelle Anthony, the owner of Sunrise Quality Mortgage to see the model 8632 that was on the lot.. Again, Barbara Duesterbeck showed them the model 8632 home. Again, Barbara Duesterbeck told them that the fireplace was wood burning.

16. The wall behind the fireplace was a solid wall in the model home.

17. During the purchase of the manufactured home, Louise Stripling asked Barbara Duesterbeck about Solitaire making any necessary repairs to the home after it was set up, and Barbara Duesterbeck assured her that the company policy was that all repairs would be timely.

18. On October 4, 2002, relying on the various statements by Barbara Duesterbeck, Louise Stripling went to Solitaire and signed all necessary paperwork for the purchase of the manufactured home with the color scheme she preferred and the word burning fireplace. The documents included; 1) purchase contract, 2) acknowledgment of terms of

agreement, and; 3) a document in which Solitaire represented that it would fix all problems with the manufactured home "on a timely basis." Louise Stripling also received a floor plan.

19. Mrs. Stripling gave a $500 down payment at the time the documents were signed.

20. Under the terms of the purchase contract, the Striplings had to pay the entire purchase price, $88,096, before taking delivery of the home.

21. Barbara Duesterbeck told Louise Stripling that the home would be delivered in about two weeks.

22. The Striplings believed that the foundation would be completed and the home delivered and set up by mid-November, at the latest.

23. At the time of the purchase, Louise and Gary Stripling had been pre-approved for a mortgage at Sunrise Quality Mortgage.

24. The Truth in Lending disclosures Sunrise Quality Mortgage provided to her show that the Annual Percentage Rate was 6.985%, the finance charge was $197,059.96 the monthly payment was $1019.55, and the total of payments over the life of the mortgage was $344,491.55.

25. The mortgage through Sunrise Quality Mortgage could not be funded until the manufactured house was placed on a permanent foundation.

26. In order to pay for the home, have the permanent foundation installed, and necessary preparation of the land, the Striplings took out a "construction" loan from Vectra Bank, in the amount of $146,334.86.

27. Under the terms of the construction loan, the Striplings were to make six monthly interest payments and then pay off the principal no later than May 5, 2003.

28. The Striplings planned to pay off the construction loan by December, 2002, as soon at the home was delivered and set up.

29. The Striplings, based upon representations by the defendant's employees, arranged to have Vectra Bank pay Shauna, Inc. the full price of the home, on behalf of the Striplings on or about November 13, 2002.

30. The home did not arrive in late October as promised, nor did it arrive in November 2002. Louise Stripling made several calls to Barbara Duesterbeck to check on the status of the home.

31. During this time period, the Striplings prepared the land and foundation, to be ready for delivery of the home.

32. The Striplings learned in late November that their home was at the Solitaire lot in Los Lunas, New Mexico.

33. The Striplings traveled to Los Lunas to see the home, because they were uneasy about the transaction taking so long.

34. At the Solitaire lot in Los Lunas, the Striplings saw the outside of the home that was identified as their home. They saw that the wall by the fireplace was not solid, but rather, had a moon shaped window and a vent below the window.

35. The Striplings talked to a man at the lot, who told them the vent was for the gas-burning fireplace.

36. The Striplings were very upset, because they made a decision to purchase the home based upon representations about the timeliness of the delivery of a model 8632 with the color scheme they preferred and a wood burning fireplace. They wanted the wood burning stove because 1) propane was expensive; 2) they had a considerable amount of wood on their property; and 3) they preferred the coziness of a wood burning fireplace.

37. Louise Stripling immediately called Barbara Duesterbeck, who advised her to go to the Albuquerque Solitaire lot and talk to a representative of defendant. The Striplings then drove from Los Lunas to Albuquerque and met with "Martha" at the Albuquerque Solitaire lot. Martha told the Striplings that she would have to talk to George Sulima, but suggested that the Striplings get estimates to convert the fireplace from gas to wood burning, or that perhaps the Striplings could take the model 8632 on the lot, and paint it and change out the carpet.

38. Martha told the Striplings that Mr. Sulima would call them on Monday, which would be the Monday after the Thanksgiving weekend.

39. Louise Stripling collected estimates for a conversion and faxed them to both the Albuquerque and Farmington Solitaire lots.

40. George Sulima did not call Louise Stripling until Friday, December 6, 2002. At that time, he called her at Sunrise Quality Mortgage. He asked her why she wouldn't just take "that damn house," and told her "to stop being an ass."

41. George Sulima refused to pay for the conversion of the fireplace from gas to wood burning and instead offered Louise Stripling $500 to pay for propane if she would go ahead and accept delivery of the manufactured home that was at the Los Lunas lot, which she rejected.

42. Under the terms of the purchase contract, Solitaire was required to return to the Striplings their entire purchase price, minus any costs incurred by Solitaire, if the Striplings failed to complete the purchase for any reason. However when Louise Stripling asked George Sulima for Solitaire to simply return her money, he told her, "I don't give refunds."

43. Because this manufactured home was not a special order, the only costs Solitaire incurred were the freight costs of approximately $3,500.00.

44. After George Sulima refused the request for a refund, on December 6, 2002, the Striplings sent a letter via facsimile transmission from the Sunrise Quality Mortgage office to both the Farmington and Albuquerque Solitaire lots, rejecting the home and demanding return of their money. Solitaire received this letter.

45. Shauna, Inc.'s refusal to return the money was a breach of the contract between the Gary and Louise Stripling and Shauna, Inc..

46. The Striplings retained a Farmington attorney and filed a lawsuit in state district court in Farmington. They were later ordered to go to arbitration, due to an arbitration agreement signed at the time of purchase.

47. The Striplings continued to rent and to occupy the single wide manufactured home while the dispute between the parties continued.

48. The Striplings were required to pay for water service to their land which would be hooked up to the manufactured home once delivered, even though they were not living there, in the amount of $37.81 a month.

49. When the construction loan through Vectra Bank became due and owing on May 5, 2003, the Striplings obtained a 90 day extension.

50. Vectra Bank told the Striplings that they would have to get the loan paid off by the end of the extension or Vectra Bank would foreclose the lien on their land, which was security for the loan.

51. Julie Hash, from Vectra bank, at the request of Louise Stripling telephoned Solitaire's Farmington lot and told Barbara Duesterbeck that the Striplings would be willing to take

the model 8632 home on the lot, if Solitaire would agree to buy the paint and replace the carpet in the model, to conform to the Striplings' desired color scheme. Solitaire refused the offer.

52. In approximately early July, 2003, under duress, due to the fear of losing their land, the Striplings decided they had to take delivery of the Solitaire home, even though they did not want it and had previously rejected it.

53. Solitaire delivered the home to the Striplings' land on July 30, 2003.

54. Solitaire damaged the home in transport, tearing out part of the underbelly and destroying three outriggers. In addition, a top corner of the house was crunched and exhaust fumes or road material, or both, discolored the home.

55. Solitaire left the inside of the home a mess. The floors and carpet were dirty, windows were left open by the work crew during a rain storm, causing water damage, ties were left on the cabinets, trash was left around the inside of the home, and storm doors were left leaning up against walls in the home. The walls were also dirty and paint was chipped.

56. According to George Sulima, this is the normal way Shauna, Inc. leaves its manufactured homes after set up and delivery.

57. Barbara Duesterbeck represented to Louise Stripling that Solitaire normally cleans the home for the customer after the sections are joined together and the drywall is finished.

58. The Striplings had to clean the home themselves, beginning on August 23, 2003.

59. Louise Stripling spent the next seven days cleaning, which aggravated her back condition.

60. Gary Stripling took off two days of work to help clean. At the time, Gary Stripling was making $300 a day.

61. The Striplings were seriously inconvenienced in having to take the manufactured home that they had properly rejected, but due to the financial situation and their family needs, they moved into the home in late August, 2003.

62. Shauna, Inc.'s warranty is combined with the manufacturer's warranty, so it is unclear which entity is responsible for necessary repairs under warranty.

63. Shauna, Inc.'s warranty requires that the Striplings give it *written* notice of any warranty issues.

64. Shauna, Inc.'s warranty, requires that a consumer notify in writing *both* the dealer and the manufacturer.

65. The warranty was not provided to the Striplings at the time of sale or delivery of the manufactured home in violation of the manufactured home regulations for the State of New Mexico, nor does it provide an address and telephone number of the dealer, so that the consumer may contact Shauna, Inc. regarding warranty problems.

66. By the time that the Striplings closed on the manufactured home sold to them by the defendant, they could no longer get the Sunrise Quality Mortgage that had been approved in October, 2003.

67. The Striplings were able to obtain a mortgage through Vectra Bank to pay off the interim construction loan. The terms were not as favorable as the mortgage that they had previously pre-qualified for and received a commitment through Sunrise Quality Mortgage. The Annual Percentage Rate on the mortgage was 7.466%; the Finance Charge was $221,322.06; the total of payments was $372,707.54. The Striplings did not borrow any additional amounts in the final mortgage for any other items, so the increased loan amount is due to increased points.

68. The Striplings had to get a second appraisal done for this mortgage, which cost $478.13.

69. The Striplings made all the required monthly interest payments on the Vectra construction loan from December 2002 to September 2003, in the amount of $ 10,650.49, when it was paid off through the final mortgage.

70. Louise Stripling called Shauna, Inc. several times regarding the damage to the home and the condition of the home and requested that they be corrected. She also provided Shauna, Inc. with a list of items that needed to be fixed which Shauna, Inc. received on August 25, 2003.

71. The Striplings provided additional damage lists through their attorney.

72. Although the "punch list" contained numerous items needing repair, the only items Shauna, Inc. addressed were:

    a. On September 2, 2003, Scott Dunnigan, installed half of the air conditioning. He installed the other half two weeks later.

    b. On October 17, 2003, Earl Newell patched the panel damaged by the outriggers being bent.

  c. On November 21, 2003, Eagle Welding welded new outriggers onto the underneath of the home.

73. The Striplings were never uncooperative or obstructive with making arrangements to be available for the warranty repairs to be made of with the set up or repair men.

74. The gas burning fireplace is not working. An employee of Thriftway Propane told Louise Stripling that there was something wrong with the fireplace, and he would not turn on her propane without capping off the fireplace.

75. It was not until December 2003, that Solitaire Homes, LLC, the manufacturer of the home, came to the Striplings to do repair work that was contained in the previously provided punch list.

76. The entire outside of the house needs to be repainted. In addition, the air conditioning is draining underneath the home, which is not proper and could damage the foundation.

77. The manufacturer promised to paint the outside of the home in the spring, but refuses to fix the fireplace or the problems with the installation of the air conditioning drain.

78. The Striplings would not have bought the home from Shauna, Inc. if they had known that 1) that the fireplace was not wood burning, or 2) that Shauna, Inc. would not make repairs timely.

79. Plaintiffs Gary and Louise Stripling are entitled to damages from the defendant in the amount of $20,000, in addition to the actual and punitive damages for Breach of contract, Fraud, and Breach of Warranty and violation of New Mexico's Unfair Practices Act.

## Actual Damages

80. Plaintiffs sustained $ 40,407.15 in actual damages, as follows:

  a. Lost time in the amount of two days of work for Gary Stripling in the amount of $600.00.

  b. Additional months of interest on the Vectra construction loan in the amount of $10,001.57 (January through September, 2003 payments);

  c. Additional interest that will be paid over the 30 year life of the mortgage, in the amount of $24,262.10;

  d. Additional rent that they paid for the single wide manufactured home for nine months in the amount of $4,725;

e. Payment for water service to their land, while still living in rental unit, for nine months in the amount of $340.29;

f. Cost of a second appraisal for the final Vectra mortgage, in the amount of $478.19.

## Punitive damages

81. Plaintiffs Gary and Louise Stripling are entitled to punitive damages for each cause of action and for violation of the New Mexico Unfair Practices act for the intentional misrepresentations made by Defendant's employees concerning the manufactured home offered to them which were made to induce them to purchase the manufactured home which they would not have purchased otherwise.

82. Shauna, Inc. employees George Sulima and Barbara Duesterbeck misrepresented under oath at the arbitration hearing, that the model 8632 that the Striplings viewed had a gas burning fireplace.

83. J "Pete" Hogstad misrepresented under oath at the arbitration hearing that the manufacturer had never sent a model 8632 with a wood burning fireplace to the Farmington Solitaire lot.

84. Shauna, Inc. acted in bad faith and engaged in wrongful conduct, through the following conduct:

a. Damaging the home during delivery in July, 2003, and refusing to repair the damage until November, 2003.

b. Failing and refusing to timely correct the many deficiencies in the home.

c. Sending an unqualified employee to perform welding under the manufactured home.

e. Refusing to return the Striplings' purchase money when the Striplings rightfully rejected the home on December 6, 2002.

f. Mr. Sulima's verbally abusive treatment of Louise Stripling on the telephone on December 6, 2002.

g. Misrepresenting at the arbitration that there had never been a model 8632 with a wood burning fireplace on the Farmington lot, and that the model 8632 the Striplings had viewed on the lot had a gas burning fireplace.

85. Based on the foregoing actions, Shauna, Inc.'s actions with regard to the Striplings were malicious, willful, wanton, in bad faith, and in reckless disregard to their rights. The

defendant has engaged in similar practices with other customers in the past in which they did not comply with the terms of the contract after receiving the buyers money.

A.   Leeson Velarde negotiated to have a refrigerator, washer, and dryer deleted, and substituted air conditioning. These terms were written into his contract with the defendant Shauna, Inc.. Based on these representations, Velarde gave Shauna, Inc. an $11,121.60 deposit. Later, Shauna, Inc. contacted Velarde and told him it would not do the substitution of the appliances for the air conditioning. Velarde telephoned George Sulima and asked for his money back. Sulima refused and called Velarde a "freaking idiot." Velarde was able to get his money back only after arbitration, which took nearly two years.

B.   Victor Harp, Catherine Villareal, and Catherine Smythe also obtained arbitration awards against Shauna, Inc. for conduct similar to the conduct in the Stripling matter.

86.   Punitive damages are appropriately awarded in this action to punish the defendant and to deter defendant and others from conduct similar to that in which it engaged with the Striplings.

87.   The Striplings are entitled to an award of punitive damages from Shauna, Inc., d/b/a Solitaire Homes in the amount of $50,000.00.

## CONCLUSIONS OF LAW

1. Barbara Duesterbeck was acting within the course and scope of her employment with Shauna, Inc. in her dealings with the Striplings.
2. George Sulima was acting within the course and scope of his employment with Shuana, Inc. in his dealings with Louise Stripling.
3. The actions of Shauna, Inc.'s employees are viewed cumulatively to determine the Defendant's mental state (intent to commit tortious acts of fraud, conversion, breach of duty of good faith and fair dealing, and bad faith breach of contract) to warrant imposition of punitive damages.
4. Shauna, Inc. ratified the actions of its employees.
5. The Striplings' December 6, 2002 demand for the return of the purchase price, before delivery of the manufactured home, was rightful rejection of non-conforming goods under the Uniform Commercial Code.

### Fraud

6. Plaintiffs proved by clear and convincing evidence Shauna, Inc.'s misrepresentations of material facts.

7. Plaintiffs proved by clear and convincing evidence Shauna, Inc.'s knowledge of the falsity of its misrepresentations, or reckless disregard as to whether its statements were false;

8. Plaintiffs proved by clear and convincing evidence that Shauna, Inc.'s misrepresentations were made with the intent to deceive Plaintiffs.

9. Plaintiffs proved by clear and convincing evidence that Shauna, Inc. induced Plaintiffs to rely on Shauna, Inc.'s misrepresentations, and Plaintiffs did in fact rely.

10. The Striplings are entitled to punitive damages for the fraud committed, in order to punish Shauna, Inc. and to deter it and other manufactured home dealers from committing fraud of this nature.

### Breach of Contract

11. Shauna, Inc. breached it contract with the plaintiffs Gary and Louise Stripling when it refused to refund the purchase price under the contract when properly demanded.

12. Shauna, Inc. breached the duty of good faith and fair dealing, which is implied in every contract in New Mexico.

13. Shauna, Inc. failed to act in good faith, by failing to deliver the home as represented, damaging the home in delivery and failing to repair it timely, failing to repair other problems with the home, failing to forward the Striplings' list of needed repairs to the manufacturer, and failing to return the purchase price.

14. The Striplings are entitled to damages for the defendants bad faith and egregious conduct in breaching the contract between the parties.

15. The Striplings are also entitled to an award of punitive damages, to punish Shauna, Inc., and to deter Shauna Inc. and others, including other manufactured home dealers from breaching their contracts and their duties of good faith and fair dealing.

### Breach of Warranty

16. Shauna, Inc. breached its dealer's warranty, by failing to repair problems with the manufactured home.

17. As a result of Shauna, Inc.'s breaches, the Striplings suffered damages which they are entitled to recover.

## Damages

18. The plaintiffs are awarded a total of $60,407.15 against the defendant for Fraud, Breach of Contract, and Breach of Warranty, punitive damages of $50,000.00, and costs of $2,103.45

## Unfair Trade Practices

19. Shauna, Inc., through its authorized employees, knowingly made representations that were false or misleading in connection with the sale of goods, when its representative(s) stated that the manufactured home that was available for sale to the plaintiffs, Louise and Gary Stripling had a wood burning fireplace, and that the Plaintiff would timely and properly make repairs to items covered under warranty;

20. The false or misleading misrepresentation occurred in the regular course of the Shauna Inc's trade or commerce;

21. The representations deceived and mislead both Louise and Gary Stripling.

22. Shauna, Inc's misrepresentations, were made knowingly and wilfully.

23. Shauna, Inc. violated the New Mexico Unfair Trade Practices Act, § 57-12-1 *et seq.* by its false or misleading representations pertaining to the wood burning fireplace and that it would timely repair items.

24. The Striolings are entitled to actual damages of $ 40,407.15 under the Unfair Practices Act.

25. The Striplings are entitled to Punitive damages in the amount of $50,000.00 under the Unfair Practices Act.

26. The Striplings are entitled to their attorneys' fees under the New Mexico Unfair Practices Acts in the amount of $16,232.50 which are reasonable under the circumstances.

## Arbitration Expense

27. The total arbitration fee is $3,134.78 for conducting the hearing and preparing the findings and conclusions and the Award. Each side is ordered to pay one-half of the arbitration fee.

_____
William Riordan, Arbitrator
3227 El Toboso NW
Albuquerque, NM 87104

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the Arbitration Award was mailed to Gordon Rowe and Susan Warren this 31st day of March, 2004.

_____